Good morning. I'm Phil DePere. I represent the appellant on this matter. Your Honor, I think we need to just go back for a moment and look at the memorandum of the decision of July 14, 2003, when this Court reversed Judge Rios' granting of summary judgment. At that point in time, the parties had filed their pretrial conference orders in the lower court and summary judgment had been granted. On the eve of trial, and in that memorandum, this Court found that and held that its holding in reversing summary judgment does not render the portions of the agreement discussing initial funding or to provide initial funding as surplusage. Those provisions concern non-exclusive sources of payment, not whether H.O.E. Hinden-Owen will receive payment. In fact, when we went back and tried the case, that's exactly the argument that Respondent made and was adopted by the district court at trial, that somehow we had to be the procuring cause of the funding. And we think that's error. We were exclusive. But what about the parole evidence that was admitted, which seemed to indicate the contrary? No, we think that that parole evidence was improperly admitted. But if it were properly admitted, then that would pretty well explain what the Court did, wouldn't it? Not necessarily, because I think that you have to – let me address that first. Go ahead on your own time. Sure, that's fine. I'll answer the question directly. The parole evidence statement with the telephone conversation in which Mr. Hinden was reported to have stated, if we don't bring money to the table, we don't get paid, or words to that effect. Because the matter came up on a Rule 52 motion, the close of our case, we had no opportunity to rebut that. But nonetheless, that language is directly contrary to the express language of the subsequent written agreement. The agreement that was entered into after that alleged telephone conversation, which Mr. Hinden denied, was that we were exclusive. So if we were exclusive, if there was a funding from any source whatsoever, from any other person or entity, we earned our fee. If that was of concern to the parties, it was certainly a matter of – it should have been addressed in the written agreement. I'm sorry. The Ninth Circuit – the prior panel says that there was a genuine issue of material fact with respect to what constitutes a lending program, funding commitment, et cetera. Doesn't that open the door, then, to parole evidence? Because there's a factual issue about what the meaning is. That's the law of the case. The issue is what the funding was, not what the duties or obligations of HOE were. In other words, the question was, what constitutes a funding? What constitutes a credit facility? So certainly that was an issue in the case. Well, that goes to my real question, is that – is whether the amended and restated FANOVA loan was either a lending program or a funding commitment. Or credit facility. Where does it say credit facility? Or credit facility in the letter agreement. I'm looking at – it says HOE shall receive the placement – the agreement that says HOE shall receive a placement fee, equalling da-da-da-da, of the gross credit facility or facilities made payable out of the initial funding proceeds. Okay. Shall be deemed earned when FS obtains a funding proposal provided by a lender, exclusively with FS full cooperation, receives approval, or when – so you're saying it either has to be a credit facility, a lending program, or a funding commitment. Right. And we think that – and here's where I think the district court – But can I just finish my question? Sorry, Your Honor. But under the arrangement with FANOVA, FS didn't receive any funds. Yes, it did. How did it receive funds? Didn't it pay funds? No, it didn't. Let me – well, let me address that. The credit facility was a new loan. It was a new loan by FANOVA. Remember that health – Four Seasons was not in existence at the time of the original loan to Health Field. It was a new loan. FANOVA had no obligation to loan any money to Four Seasons. What happened was that Four Seasons was allowed to purchase the stock of Health Field in a uniform commercial code foreclosure sale. And incidental to that foreclosure sale, FANOVA made a new loan to a new company on terms which mirrored, certainly to some extent, the loan that had been made to Health Field. But whether it mirrored it or not, the long and short of it is Health – Four Seasons had no lending obligation to FANOVA, had no dealings with FANOVA at any time, and borrowed money from FANOVA if in fact what happened was there was no cash out of the loan proceeds because in order to permit Four Seasons to acquire Health Field, there was no net proceeds available. Nonetheless, Four Seasons got what it wanted. It bought all the assets of Health Field in a foreclosure sale. And it did it with the consent of FANOVA, with FANOVA basically giving a new loan to a new entity of Four Seasons so that that sale could be consummated. And we say that's a lending program by any stretch of the imagination. But even if that were a lending program as you might objectively consider it under financial terminology, since the law of the case is it's a question of fact as to whether this particular program constituted a lending program under the letter agreement, why wasn't the district court correct in letting in parole evidence and then making a determination that for this letter agreement it wasn't? Here's exactly why. It wasn't a lending program. Because the district court didn't really do that. What the district court did, what Judge Reel did was he found that there was no contract. Now, that's key. That's ironic too because then the board's attorney's fees under a non-existent contract. And that's one of our grounds here. No, there's either a contract or there's not a contract. Right, but I want to address Your Honor's question. Judge Reel said there was no contract between HOE and Four Seasons. That didn't exist. And, in fact, instructed that that be included in the findings. He accused us, I think Mr. Kim also, of somehow foisting jurisdiction on the court by doing that. In fact, Mr. Winley was not a resident of California, and there would have been diversity in any event, but it ignored two years of pretrial statements in which the stipulated facts between the parties were, and I was reading from paragraph 12 of the pretrial conference order, the letter agreement is a valid and enforceable agreement under California law between plaintiff and defendant. That's paragraph 12 of the pretrial conference order. The pretrial conference order was reaffirmed after remand. We went back and tried the case based on the same pretrial conference order. It came as a total shock at the end of the trial that Judge Reel says there's no contract here. And then, now to answer your question, Mr. Winley had to come up with $2 million to close the FANOVA deal on the foreclosure. And what Judge Reel was saying was, wait a minute, you didn't earn any fee, because the word other has to mean somebody other than Mr. Winley. And since it was Mr. Winley who went and got the money to do the deal, you didn't earn a fee. That's what's said. Now, that is fundamentally wrong, because we would say that even if Mr. Winley went and had to bring $2 million to the table to close the deal, to allow FANOVA to go forward with the deal, we're entitled to a fee based on that, because we were exclusive. If anybody brought any kind of a lending program that Four Seasons accepted, we earned a fee from any source. Now, other was misconstrued, because, first of all, Mr. Winley was not the party, and this Court, in its earlier memorandum, concluded that there was a contract between Four Seasons that was never endowed until the end of the case. Well, certainly the Ninth Circuit, if you're going to be following the law of the case, implicit in its decision was that there was a contract. Right. And the reason it held summary judgment was improper was that there were genuine issues of material fact, particularly with respect to whether FANOVA's capital corporations agreement was a credit facility or facilities, a funding proposal, a lending program, a funding commitment, or a fund. Now, did Judge Real answer that question? No, he did not. That's right. So that's what my problem is with what happened on remand. I don't know. The parole evidence that he admitted doesn't go to that question. Exactly. He didn't address the FANOVA deal at all because he, with all due respect, became caught up with the fact that it was Mr. Winley who signed the contract. Four Seasons didn't come into existence until a couple months later. We didn't know that, of course, when Mr. Winley signs the contract as chairman. We have it at page one of the record when we get it out. As chairman, we are reasonably led to believe that, well, gee, that's who we're dealing with. It came out in discovery in the case that Four Seasons hadn't been formed yet. But nonetheless, we weren't going to go back and reinvent the wheel. We weren't going to sue Mr. Winley for fraud that he misrepresented to us. Well, there seems to be, there might be an alter ego question since he was CEO of, was it Health? Of Health Field. And then owned stock there and then was going to create this new company. Basically what he did, what happened was they jettisoned a defunct and failing company. And with the cooperation of the lender to Health Field, Mr. Winley was able, we really think, to hurt the shareholders and investors in Health Field by going out and make, while he's a director and shareholder in Health Field, go back and, with all, excuse my French, screw the shareholders in Health Field and start a new company and pick up all those assets and get a new deal with Phenova. Did he get sued by any of the health field? We don't, I don't know. But the long and short of it is we're brought in two months before to facilitate the acquisition of Health Field. And that's exactly what gets accomplished. The record was also clear that we did, in fact, bring another lender to the table. We brought Heller Financial, which wanted to share, it's in the record, which wanted to share a new facility with Phenova. And that was rejected by Health Field. But nonetheless, we fully performed. So we don't think that the district court answered this court's question by directing about what the Phenova deal was all about. And we think that it's really an issue of law, that all of the Phenova loan documents, and they were extensive, and the foreclosure documents were received in evidence. It's addressed in detail in the pretrial statement. We did not want to get into that. Mr. Kim and I stipulated to the effect of the foreclosure, how the foreclosure took place, what Phenova did, what the loan documents were, and the end product is basically HOE brought Phenova to the table, to the table with Health, with Four Seasons, because it was going to be a joint venture between Heller Financial and Phenova. So we don't know. The district court did not address any question at all about the effect of Phenova, because the district court, with all due respect, was caught up with the fact that it was Mr. Winley who brought $2 million. Since there was no contract between HOE and Four Seasons, apparently he said there was no contract or a void contract with Mr. Winley. Mr. Winley brought $2 million, and therefore that doesn't qualify because the word other in the contract can hardly be deemed as a matter of law to mean Winley. Did you raise any agency questions? When someone holds himself out to be an agent of a company, whether it exists or it doesn't exist, that that person would be responsible? We didn't think it was necessary in view of what we stipulated to in our pre-trial. We solved the problem, Your Honor. Let me get the pre-trial statement out again. We stipulated, let's see. Let's see. Paragraph 9. On January 11, 2001, Hinden and Four Seasons entered into a written agreement, a true copy of which is Exhibit A to the pre-trial conference order. Paragraph 10. The letter agreement provides the plaintiff would represent defendant in its efforts to secure senior secured and or subordinated debt or equity financing for the acquisition of Health Field. Paragraph 11. The letter agreement provides that plaintiff would represent defendant exclusively for a period of 120 days. It was signed by Rodney Winley on behalf of Four Seasons. That's the January 11 agreement. The letter agreement is a valid and enforceable agreement under California law between plaintiff and defendant. We wanted to get beyond that and get to the nub of the case from the memorandum. The nub of the case is what was the FANOVA transaction that Four Seasons. And, in fact, that wasn't even addressed at the trial. And I read the finance and banking conclusion a while ago, but was it addressed in there? No. It's just void. Again, I was criticized, I think unfairly, for bringing a case that I guess the court was saying was some sort of a subterfuge because it was really a case that the court didn't have jurisdiction. And that's exactly what Judge Reel said in ruling on Mr. Kim's motion. I'm reading from page 49 of the transcript. In the record, it's page 380. The court, this is Mr. Kim. Your Honor has had the opportunity to hear the plaintiff's case in chief, and we believe it's appropriate for the judge to be entered in favor of Four Seasons. As the court knows, this is a simple breach of contract case. The court. Counsel, you folks have been talking about a contract with Four Seasons. While this contract was entered, Four Seasons was not in existence. How do you make a contract with a dead entity? It was Mr. Winley doing business as Four Seasons was all I could find in the evidence. Mr. Kim goes on. The court, it's not a technicality. The court, the company was not in existence at that time, so how can you pin any liability on a company which was not in existence at the time that the contract is claimed to have been violated or breached and was not in existence? Mr. Kim is going on. The court, there is no evidence to me that it was ever affirmed as such after that. Well, we say, what were we doing in our pretrial conference order? We were agreeing that this was a valid enforceable contract between Four Seasons and HOE. So as far as we're concerned, we never got a trial on the issues that were addressed in the memorandum when this case first came up on summary judgment. Counsel, in looking at the findings of fact and conclusions of law in paragraph 23, I see two statements that seem to relate to this issue. One says that the court observes that Four Seasons was not a legal entity, and the second one says that HOE did not introduce any evidence that Four Seasons was a party to the engagement agreement. Are there any other statements in the finding of fact and conclusions of law by the judge, by the district court? I don't think so. It's just those two statements? I think so. And I know that we know from the trial record that the court expressly instructed Mr. Kim to make sure you put in the findings the fact that there was no contract between the parties. But the court does not, in fact, find that there's no contract, there's no statement of that. You're inferring that from those two statements? I'm inferring that from what I just read in the record of the ruling on the motion for judgment to close a plaintiff's case. I just read from the trial transcript. And also I cited where Mr. Kim was directed to put that in directly into the findings. All right. But it's not framed in a finding as to the contract. It's framed as it is. Okay. I don't think there was any doubt as to what the court was doing. The court, I think, found that there was no contract. It then proceeded to award attorney's fees for a non-existent contract when California law says if you don't have a contract, you don't get attorney's fees. That, of course, I want to just briefly address the issue. I think I have a minute or so left. We, of course, don't even concede that even if there was a contract, there were attorney's fees, because attorney's fees was not reserved as an issue in the pretrial conference order because we took the position that the contract only sought recovery of costs. And I cited my authority in my brief, which I won't repeat in argument, for the proposition that costs are not fees. And California law is very clear on that. Attorney's fees are not recoverable costs unless there's a contract that specifically provides for the award of attorney's fees to one side or the other. And it makes it reciprocal. But didn't you ask for attorney's fees? No. In your complaint? Isn't there a fine in that? Did you ask for attorney's fees? No. The pretrial conference order, it was addressed in the pretrial conference order. What about your complaint? You know, I can get to it in the file. I don't want to misstate. I believe I did not ask for any attorney's fees, but I don't want to misstate. Okay. Well, anyway, your time's up. So thank you very much. Thank you. Good morning, Your Honor. This may please the Court. Raymond Kim on behalf of Appaloof Four Seasons Healthcare. Your Honor, from the appellee's position, this panel has presented what we believe is a very straightforward appeal. There are basically three issues that are pertinent to this appeal. First, did the district court commit clear error in granting Four Seasons' motion for judgment as a matter of law regarding the contract that was at issue in this case? Second, did the district court commit clear error in allowing the parties to present extrinsic evidence to help explain the various provisions of that contract? And third, did the district court commit error in granting Four Seasons' motion for attorney's fees? I think there's a fourth question. Yes, Your Honor. Did the district court err in failing to follow the mandate of the Ninth Circuit? The district court did not follow the mandate of the Ninth Circuit. When this matter came before the Ninth Circuit, after the court had granted summary judgment, the Ninth Circuit found that there were tribal issues of fact with respect to various terms of the engagement agreement. In Four Seasons' motion for summary judgment- Hold on a second. All cell phones need to be turned off immediately. We do not allow them in the courtroom. So take a second, turn them off. All right. Go ahead. I didn't hear what you were- say your last sentence again. Yes, Your Honor. The district court did comply with the mandate of this Ninth Circuit in its trial, which followed the reversal on appeal. In its motion for summary judgment, Four Seasons took the position that there were no tribal issues on the basis that the loan program, which was at issue here, clearly and indisputably fell outside the scope of the engagement agreement. This court found that, in fact, there were ambiguities in various terms, including lending proposal, credit facility, initial funding proceeds, and various other terms, and reversed, basically for the reason that the court needed to look at contested extrinsic evidence- What it was supposed to look at is whether the FANOVA restated and amended agreement constituted a credit facility, a lending program, or financial, whatever those three or four words that they used. And Judge Rill never answered that question. And the evidence that he took that was extrinsic was evidence of the circumstances of the making of the agreement, not what do those terms mean. And also implicit in the decision of the Ninth Circuit was that there was a contract. And Judge Rill found, no, there wasn't. So, to me, I'm just having a real, seeing a real disconnect between what the district court did and what the Ninth Circuit told them to do. What the Ninth Circuit told the district court to do is to decide, based on contested evidence presented by the various parties at trial, what the meaning of the engagement agreement was and whether that engagement agreement fairly encompassed the FANOVA amended and restated loan. Now, with respect to Your Honor's observation that there was no evidence of what that loan was, I believe the record is to the contrary. The entire loan agreement and all the subsequent agreements were admitted as evidence in trial. Judge Rill reviewed those loan documents, and that review was part of his decision. With respect to the evidence presented at trial from Mr. Windley, Mr. Hinden, and Mr. Strange, that evidence clearly was meant to help explain which particular types of loans or lending programs would be encompassed in the engagement agreement. The judge, Judge Rill, was given all of the FANOVA loan documents. And so with respect to what the FANOVA loan was, Judge Rill had a complete record of what that lending program was. What Judge Rill also was trying to do at trial was to understand whether the engagement agreement contemplated that an amended and restated loan, which followed a public foreclosure sale, was fairly encompassed in the engagement agreement. And the conclusion that Judge Rill reached after hearing full testimony from the various witnesses and after the plaintiff had rested its case in chief was that, yes, there was conflicting evidence. Mr. Hinden said, basically, that we always contemplated that an amended and restated loan would fall within the engagement agreement. However, there also was evidence, including Mr. Windley's testimony and supporting documentation, that basically, no, under the circumstances in which this contract was formed, the contract was meant to encompass only new sources of financing, which would help Four Seasons purchase the assets or the stock of Health Field and replace FANOVA as a lending entity. Now, again, of course it was conflicted evidence, but that was the mandate of this court, to have that evidence heard, and Judge Rill did hear that evidence. How would you take the statements in paragraph 23 by the court observing that Four Seasons was not a legal entity at the time the engagement agreement was signed and that HOE didn't introduce evidence that Four Seasons was a party to the agreement or bound by it? Does that mean, was he finding in effect that there was no contract? I believe Judge Rill was finding as an alternative grounds that, in his opinion, the plaintiff had not met its burden of proof in establishing successor liability on behalf of Four Seasons. I will say that that was not an issue that was specifically addressed by Four Seasons. You drafted these findings of fact and conclusions of law, correct? That's correct. They could have been clearer on that point. Well, Your Honor, I think the record, including the ‑‑ it could have been clearer, I suppose. I mean, it seems almost like, given the prior posture of the case and the fact that you had stated, agreed in your pretrial conference, or that there was a contract, that these findings of fact and conclusions of law kind of dance around that question. Now, maybe you were put in a difficult position by what you're saying. Well, Your Honor, if Judge Rill believed that that was being unclear, he could have, of course, amended that portion of the findings of fact and conclusions of law. He didn't. With respect to the issue of dancing around, Judge Rill clearly made it known that that was an alternative ground of his decision. He heard two days of evidence concerning how to interpret the contract and whether the FANOVA loan fell within that contract. So contrary to what the appellant would have this court believe, there was a full record regarding the circumstances under which the contract was formed and the FANOVA loan. Couldn't ‑‑ if Mr. Winley had wanted to exclude any ‑‑ if Mr. Winley had wanted to exclude any of the FANOVA loans, he could have made a financial arrangement with FANOVA. Couldn't he have just said, excluding any arrangement with FANOVA in the contract, just added it in? I mean, if in fact that's what the idea was? Well, certainly that is one of the positions that was raised by the appellant with the district court. And, again, that was a contested issue. I guess the response to that, Your Honor, is he could have done that. But the absence of that in the case of the FANOVA loan, I don't know. But that doesn't necessarily mean that FANOVA was included. The contract has to be read in its totality. And under the various provisions of the contract, it was Four Seasons' position, which the district court in the end believed, that the agreement contemplated the payment of a placement fee to Hind and Owen Engelke for the securing of new financing, which would replace the FANOVA loan. And that was supported by the evidence that the FANOVA loan was included. So what was the evidence of the case? The evidence of the case was that Mr. Wendley attended a meeting in Phoenix with FANOVA, in which FANOVA announced that because Healthfield, the entity that was to be acquired, was in covenant default, that they wanted to be paid in full on their loan. There was no indication at that time that FANOVA was willing to renegotiate a loan or stay in any lending relationship with Healthfield. This was the circumstance under which Hind and Owen Engelke were to be paid in full on their loan. And really, in common sense, dictates that Hind and Owen Engelke is an investment banking company. They are retained by clients to secure financing. The court was presented with evidence that Hind and Owen Engelke touts its abilities to find new lending where existing lenders say no, which was a quote found on one of the websites of Hind and Owen Engelke. There were discussions between Mr. Wendley and Mr. Hinden regarding the scope of the engagement agreement. All of that was heard and considered by the district court. And so, Your Honor, I guess to sort of re-summarize my answer to your question, the entire case was about interpreting what the Ninth Circuit believed to be a contract with various provisions which were susceptible of more than one meaning. That clearly is the reason why summary judgment was reversed. On summary judgment, four seasons took the position, basically, that there's no way that anybody can read the contract except for the way that we read it. The Ninth Circuit found that we were wrong. And that extrinsic evidence was necessary to determine how to interpret the contract. Can you also address the attorney's fees issues? What's the basis for four seasons to receive attorney's fees? The basis for the attorney's fees is, again, an issue of contract interpretation. Under the engagement agreement, it provides that the prevailing party would be entitled to, quote, all legal costs, end quote. Now, again, the district court was presented with evidence, including the verified complaint filed by Hinden, Owen, Engelke in this case, that that provision contemplated the payment of attorney's fees. First of all, as I just mentioned, in their verified complaint, Mr. Hinden requested payment of prevailing party attorney's fees. In addition, the district court was presented with other complaints, including other verified complaints filed by Hinden, Owen, Engelke in other state cases, containing disputes with contracts, which have the exact same provision in which they specifically requested attorney's fees. If four seasons — I'm more concerned, actually, about whether four seasons was, if not a party to that original letter agreement, the basis for it now to get attorney's fees. Did it adopt the letter agreement? Is it under, I think, Civil Code 1717 is what the district court cited? Under Civil Code 1717, a non-signatory to a contract who nonetheless is sued on a breach of contract action would be entitled to reciprocity if the plaintiff is entitled to attorney's fees. And that is the basis upon which — one of the bases upon which attorney's fees can be granted to four seasons. However, as I mentioned to Your Honor previously, clearly the issue of there not being a contract between four seasons and Hinden, Owen, Engelke was an alternative ground upon which the Court found in favor of four seasons. However, contrary to what appellant would have, the Court believed, the entire trial was conducted on the basis and understanding, or at least the assumption, that there was, in fact, a contract and, therefore, we needed to interpret that contract and find out what it meant. So, again, Your Honors can't affirm Judge Reel's decision on any grounds, and we believe that Judge Reel's statement that there may not have been a contract between four seasons and Hinden, Owen, Engelke is clearly one of several alternatives. However, the main basis for the judgment was the fact that the engagement agreement and the evidence supporting four seasons' case in that case clearly did not show that the amendment and restatement of an existing loan at a public foreclosure sale in which Hinden, Owen, Engelke had no role and was not the procuring cause, could be found to be excluded from that contract. Just briefly, Your Honor, to address a couple of points Mr. DePierre stated, the record, I believe, is very clear with respect to what happened at trial. I take issue with the assertion that there was evidence, any evidence whatsoever, of any joint venture between Heller and Finova. In fact, there was evidence regarding the fact that Hinden, Owen, Engelke did present a very preliminary funding proposal from Heller. However, at trial, Mr. DePierre himself conceded that the Heller proposal was never a basis for Hinden, Owen, Engelke seeking a fee. And in fact, there was absolutely no evidence on the record regarding any alleged joint venture, which would include Finova teaming up with Heller. At that, Your Honor, I believe, unless Your Honors have any other questions, I'm prepared to rest. All right. Thank you very much, counsel. This case will be submitted, and we will take a brief recess before we take up the next case, Kerrigan v. Mukasey. Thank you, Your Honor.
judges: Thompson, Wardlaw, Ikuta